# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** <br> **BETHNY, LLC,**[1] <br>                **Debtor.** | Chapter 11 <br><br> Case No. 09-_____ (___) |
| **In re:** <br> **BETHNY PLACE, LLC,**[2] <br>                **Debtor.** | Chapter 11 <br><br> Case No. 09-_____ (___) |
| **In re:** <br> **BETHNY I, LLC,**[3] <br>                **Debtor.** | Chapter 11 <br><br> Case No. 09-_____ (___) |

## DECLARATION OF BARBARA PARASCO
## IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS

I, Barbara Parasco, hereby declare the following is true to the best of my knowledge, information and belief:

1. I am the Chief Executive Officer and President of Bethny, LLC, Bethny Place, LLC, and Bethny I, LLC (collectively, the "Debtors"). I submit this declaration (the "Declaration") in support of the Debtors' Voluntary Petitions for relief and their procedural "first day" motions for joint administration of their estates and for maintenance of their existing cash management and related systems, which the Debtors respectfully request be heard by the Court expeditiously upon limited notice to the Office of the United States Trustee, the Debtors' single

---

[1] Bethny, LLC EIN: XX-XXX4404.
[2] Bethny Place, LLC EIN: XX-XXX3536
[3] Bethny I, LLC EIN: XX-XXX4756

secured creditor, and the Debtors' combined twenty largest unsecured creditors in order to enable the Debtors to most efficiently commence their cases.

2. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by myself and former employees of the Debtors retained to assist the Debtors in gathering and analyzing financial information of the Debtors, or my opinion based on my experience with the Debtors' operations and financial condition.

3. In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by former employees of the Debtors retained to assist the Debtors under my direction in gathering and analyzing financial information of the Debtors, I have relied upon those employees accurately recording, preparing or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

4. I became affiliated with what is now the Bethny Group, described below, in March 2006 and was promoted to Chief Executive Officer and President in September 2006. Prior to joining the Bethny Group, I was employed by Macy's Department Stores for twenty years, last holding the title Senior Vice President/Regional Director of Macy's East with responsibility for all of the Long Island and New York City stores, departing in 1994.

5. Part I of this Declaration describes the Debtors and their business and the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Part II of this Declaration sets forth the relevant facts in support

of the First Day Motions filed concurrently herewith in support of their chapter 11 cases (the "Cases").

## PART I

A.  **Overview of the Debtors**

6. The Debtors are Bethny, LLC, formerly known as Balducci's, LLC ("**Bethny LLC**"), Bethny LLC's indirect subsidiary, Bethny Place, LLC, formerly known as Sutton Place Gourmet, LLC ("**Bethny Place**") and Bethny Place's wholly-owned subsidiary Bethny I, LLC, formerly known as Sutton Hay Day, LLC ("**Bethny I**"). Prior to the commencement of the wind down of their businesses and the sale of substantially all of their operations and group trade name in April 2009, described below, the Debtors and their non-debtor affiliates collectively constituted a leading branded specialty food retailer with ten stores located in the New York City, Southern Connecticut and Washington, D.C. metropolitan areas and licensed food retail concessions in airports.

7. The immediate predecessor of the Debtors was a food retailer group operated under the legal entity Sutton Place Group, LLC. In late 2003, an investment group led by Bear Stearns Merchant Banking acquired the Sutton Place Group LLC stores and other related assets, later renaming the group Balducci's, LLC. The company rebranded the existing Sutton Place Gourmet and Hay Day Farms Market stores with the "Balducci's" brand.

B.  **The Debtors' Corporate Structure and Management**

8. The Debtors are part of a group (the "**Bethny Group**") that had been operated prior to the wind down described below as an integrated enterprise sharing logistical, operational, technical and financial resources.

9. The group structure is as follows. Bethny, LLC is the sole subsidiary of Bethny Holdings Group, LLC. Bethny, LLC, through its immediate non-debtor subsidiary Bethny

3

Holdings Sub, LLC, is the member manager of Debtor Bethny Place, which is the immediate member manager of Debtor Bethny I, LLC and non-debtors Bethny II, LLC and Bethny III, LLC. All of the Bethny Group members are Delaware limited liability companies. An organizational chart of the Bethny Group, including each entity's legal predecessor, is annexed as **Exhibit A** to this Declaration.

C.     <u>Circumstances Leading to the Commencement of the Chapter 11 Cases</u>

10.    In the Fall of 2008, the Board of Directors (the "**Board**") of what is now Bethny, LLC determined that the challenging retail environment, general economic conditions, and the Bethny Group's existing platform made it increasingly difficult for it to operate the retail stores profitably and embarked on a restructuring initiative. The Bethny Group engaged Duff & Phelps Securities, LLC ("**Duff & Phelps**"), an investment bank, to assist in reviewing the Bethny Group's strategic alternatives, including a sale of its operations.

11.    At the end of 2008, the Board and Duff & Phelps determined that the best course of action was to sell the stores which might be operated more profitably by a new owner. In January of 2009, Duff & Phelps delivered a Confidential Executive Summary describing the businesses to approximately twenty-nine prospective buyers pursuant to confidentiality agreements, of which approximately eight were strategic buyers and twenty-one were investment firms. Duff & Phelps received several inquiries in response to the Confidential Executive Summary. Ultimately, Kings Super Markets, Inc. (along with its affiliates, "**Kings**") proved to be the most serious with respect to the stores located in six locations (the "**Acquired Locations**"): Bethesda, Maryland; Alexandria, Virginia; McLean, Virginia; Westport, Connecticut; Greenwich, Connecticut; and Scarsdale, New York.

12.    The Board with the advice of Duff & Phelps concluded that selling the Acquired Locations to Kings was the best alternative to maximize value and enable the continued

4

employment of hundreds of workers at the Acquired Locations and certain members of the Bethny Group's management. The Board further determined that, unless another buyer emerged with respect to the remaining four stores, they likely would have to close them and liquidate the business.

**D.      Sale of Substantially All of the Debtors' Assets**

13.     Following substantial negotiation between the parties and extensive due diligence review of the assets and liabilities, condition, and past and prospective financial performance of the Acquired Locations and other assets of the companies, Kings, through its affiliates, A.G. Kings Holdings II, Inc. and several newly-formed limited liability companies (collectively, the "**Buyers**") and each Debtor and certain non-debtor affiliates (collectively, the "**Sellers**") holding assets related to the Acquired Locations and other assets sought to be acquired (the "**Acquired Assets**") entered into an Asset Purchase Agreement on March 16, 2009 (as amended, the "**APA**"). The transactions contemplated by the APA ultimately closed on April 15, 2009[4] (the "**Sale**").

14.     Among other things, the APA contained the following material terms of the Sale:

- As a condition to the Sale, the Sellers' authorized assignment to Buyers, or the applicable government authority's direct issuance to Buyers, of certain food and alcohol permits at the Acquired Locations;

- As a condition to the Sale, the assignment of leases at the Acquired Locations, and the modification of certain of such leases;

- $500,000 of the Closing Purchase Price (the "**Indemnity Escrow Amount**") would be held by Bank of America, N.A. (the "**Escrow Agent**") serving as third party escrow agent, to satisfy any indemnity claims asserted under the APA;

---

[4] Because of the timing of the transfer to Buyers of certain food and beverage permits at the Greenwich, Connecticut Acquired Location, assets relating to such Acquired Location were not sold and transferred to Buyers until April 22, 2009, and $250,000 of the Closing Purchase Price was not paid until such date.

- $476,000 of the Closing Purchase Price (the "**Tax Escrow Amount**") would be held by the Escrow Agent to satisfy certain prospective State of New York tax liabilities of the Sellers relating to certain of the Acquired Locations;

- The assets acquired would not include certain specified assets of the Sellers (the "**Excluded Assets**"), which remained the property of the Sellers and included Cash on Hand as defined in the APA, rights under the APA and related agreements, tax and similar refunds, bank and depository accounts of the Sellers, rebate checks, certain insurance policies, rights to the Andrew and Nina Balducci 1991 Insurance Trust (discussed further below), specified infrastructure, software and equipment, and royalties and fees due from Host International, Inc. or its affiliates received or due on or before the date of the Closing under the Supply and License Agreement for operation of retail concessions at airports;

- The Buyers assumed certain specified liabilities of the Sellers (the "**Assumed Liabilities**") including obligations under leases pertaining to the Acquired Locations, obligations under contracts assumed from the Sellers, liabilities under customer loyalty programs, liabilities for accrued and unused vacation time of employees hired by the Buyers, and liabilities under existing purchase orders. All other liabilities (the "**Excluded Liabilities**") remained the responsibility of the Sellers, and generally included all liabilities of the Sellers not specifically defined as Assumed Liabilities;

- The Closing Purchase Price would be adjusted upwards or downwards after the Closing by the amount by which the working capital relating to the Acquired Locations was greater than or less than, respectively, an agreed-upon amount of working capital;

- On the date of execution of the APA, the Buyers would loan the Sellers $2,000,000 to fund general operating expenses until the closing pursuant to a secured promissory note (the "**Bridge Note**") to be repaid at Closing out of the Closing Purchase Price. Subsequently, an additional $750,000 loan was made by the Buyers to fund operations until Closing which also was to be repaid at Closing;

- After Closing, the Buyers or the Sellers, as the case may be, would be obligated to reimburse the other with respect to various charges and expenses related to the Acquired Locations (such as utility and other lease-related payments);

- The Sellers made customary representations and warranties respecting the Acquired Assets and agreed to indemnify the Buyers for damages Buyers incurred as a result of breaches thereof in excess of $200,000 (the "**Basket**"), up to a maximum of $1,500,000 (the "**Cap**"), provided that the Cap and the Basket are not applicable to breaches of certain "Fundamental

Representations" (relating to authorization and ownership of assets) or breaches constituting fraud, and provided further that if the Buyers' damages exceeded the Basket, the Sellers would also be obligated to indemnify the Buyer for the amount of the Basket. The Buyers' general indemnification obligations for representations and warranties survive for twelve (12) months after the Closing, provided that the Buyers may seek indemnity from the Sellers for breaches of tax, ERISA and environmental representations and warranties until the expiration of the applicable statute of limitations; and

- The Sellers also are obligated to indemnify the Buyers for damages incurred by the Buyers comprising Excluded Liabilities, and neither the Cap nor the Basket would be applicable to such damages.

15. The gross proceeds <u>received by</u> the Sellers from the Sale after adjustments required pursuant to the APA, and after an amendment to the original APA which reduced the original purchase price, were approximately $14,600,000, including the amount that was deferred until April 22, 2009 on account of the Greenwich, CT Acquired Location. Of this amount, on the closing date, $976,000 was delivered to the Escrow Agent to fund the Indemnity Escrow and the Tax Escrow and $2,750,000 plus interest was used to repay the Bridge Note. On the closing date and shortly thereafter, the Debtors paid costs and expenses related to the restructuring project and ultimate Sale including, among others, payments to landlords for lease modifications and assignments, fees for professional services, commissions and expenses for investment banking and real estate related services, and key employee retention payments. Additional expenditures were also incurred and paid by the Bethny Group following the Sale to wind down and close the four remaining stores that were not acquired by the Buyers, including, among other costs, remaining lease obligations, wages, employee termination costs, insurance claim reimbursements, and other operational and transitional costs.

16. Moreover, under the APA the Buyers and Sellers had several remaining post-Closing obligations (some of which remain outstanding as of the Petition Date) including the following:

- The Buyers and the Sellers entered into an Inventory Purchase Agreement whereby the Buyers would buy certain remaining inventory from the stores that were not Acquired Locations at 75% of the Sellers' cost. All obligations under the Inventory Purchase Agreement have been satisfied;

- The Buyers and the Sellers entered into a Transition Services Agreement, whereby for specified fees the Sellers would provide the Buyers with certain transition services, primarily relating to accounting and financial functions that the Buyers would not be able to independently perform immediately after the Sale. As of the date hereof, the Sellers are no longer obligated to provide the Buyers with services, and all financial and other obligations of the Buyers and Sellers have been satisfied other than remaining outstanding fees for services owed by the Buyers to the Sellers;

- The Buyers, on the one hand, and the Sellers, on the other hand, are obliged to reimburse each other for real estate related charges and expenses once it becomes known the amount of expenses relating to pre-Closing periods (for which the Sellers are responsible) and the amount of expenses relating to post-Closing periods (for which the Buyers are responsible);

- The Sellers and the Buyers are obligated to engage in a process to confirm, and make appropriate adjustments with respect to, the amount of working capital acquired by the Buyer as of the Closing, and the amount of Cash on Hand as of the Closing (the "**Post-Closing Working Capital Adjustment**"); and

- The Sellers remain obligated to indemnify the Buyers as provided in the APA (the "**Indemnification Obligation**").

17. With respect to the Post-Closing Working Capital Adjustment obligation, the Sellers complied with the requirements of the APA with respect to such adjustment process and determined that the Buyers owed the Sellers an aggregate of $430,119 in respect thereof. The Buyers failed to object to such determination in accordance with the time requirements and other terms of the APA and, therefore, the Sellers' calculations are final and binding on the Sellers and the Buyers. Notwithstanding the foregoing, as of the Petition Date the Buyers have not paid the Sellers the amount due.

18. With respect to the Indemnification Obligation, as of the Petition Date the Buyers have not made any claims for indemnification. However, $248,949.91 of the Tax Escrow

Amount was released to the New York Tax Commissioner on account of tax obligations constituting Excluded Liabilities. Thus, as of the Petition Date, the entire Indemnity Escrow Amount of $500,000 and $227,050.09 of the Tax Escrow Amount, plus interest thereon, continue to be held by the Escrow Agent in accordance with the APA and the Escrow Agreement.

**E.**     **The Wind Down**

19.     Following the Sale, the Board determined that there were no viable purchasers for the stores not acquired by the Buyers and, thus, it would have to wind down its remaining operations and liquidate and close the remaining stores.

20.     As of the Petition Date, all stores and offices, including the Bethny Group headquarters office, have been closed and the premises, all of which were leased, have been vacated and surrendered to the respective landlords. All ongoing obligations to utilities and other providers of services and goods for such premises have ceased.

21.     The Debtors are in the process of identifying their actual and potential assets and liabilities and seek through the filing of these Cases to effect an orderly crystallization and liquidation thereof, so as to maximize value for their estates and through confirmation of a plan best ensure the greatest and most equitable distribution to their creditors.

**PART II**

**First Day Motions**

22.     In order to enable the Debtors to minimize the adverse effects of the commencement of the chapter 11 Cases on their liquidation efforts, the Debtors have requested certain procedural relief through two first-day motions filed concurrently with their Voluntary Petitions and this Declaration, for which this Court's expeditious consideration is respectfully requested. A summary of the relief sought in each First Day Motion is set forth below.

23. I have reviewed each of these motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to pursue with minimal disruption as expeditiously as possible the identification, crystallization and liquidation of their assets, liabilities, and current or potential disputed claims; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors and to enable the Debtors to develop for consideration by their creditors and confirmation by this Court a plan of liquidation designed to best ensure the optimal return to creditors for their claims.

A. **Motion for Order Directing the Joint Administration of Related Chapter 11 Cases**

24. The Debtors in these cases are affiliated entities. I am informed by counsel that the joint administration of the chapter 11 Cases will permit the Clerk of the Court to utilize a single general docket for these Cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in significant savings to the estates. Accordingly, I believe that the relief requested in the joint administration motion is in the best interests of the Debtors' estates.

B. **Motion for Order Authorizing Maintenance of Bank Accounts, Continued Use of Business Forms, Continued Payment in Ordinary Course of Self-Insured Employee Health Benefits Claims, and Limited Waiver of §345(b) Deposit and Investment Requirements**

25. The Debtors maintain on a consolidated basis bank accounts at Wilmington Trust and BB&T Corporation (the "**Bank Accounts**"). The Debtors similarly maintain a collective, consolidated cash management system (the "**Cash Management System**").

26. The business operations of the Debtors ceased by the end of June 30, 2009. Accordingly, the Bank Accounts and the Cash Management System since that date have been

maintained for the orderly wind down of the Debtors' estates and the motion seeks their continuation in aid thereof.

27. One Bank Account is a special account maintained for payment of employee health benefit claims (the "**Self-Insured Account**") through the Debtors' self-insured health benefit plan. Pursuant to the plan administration agreement, claims made are resolved and paid directly from the Self-Insured Account upon instructions from the plan administrator. A schedule of claims made, resolution thereof and payments thereon is provided to Debtors on a regular basis.

28. As of the cessation of the Debtors' business on June 30, 2009, the Debtors no longer had employees other than a few administrative personnel. However, health benefit claims incurred by former employees while in the Debtors' employ remain outstanding. The Self-Insured Account, thus contains funds in an aggregate amount that has been determined actuarially as potentially to be required to pay health claims already filed, as well as those which may have been incurred during the 180 days prior to cessation of the Debtors' business or shorter eligibility time period, but which to date have not been reported. Accordingly, the Debtors seek authority to continue to segregate the proposed requisite amount, maintain the Self-Insured Account bank account, and pay eligible claims as they come due in the ordinary course.

29. It is my understanding that United States Trustee requirements mandate that prepetition bank accounts of chapter 11 debtors be closed and new debtor-in-possession bank accounts opened postpetition. The Debtors seek a waiver of this requirement in these Cases. It is my belief that, if strictly enforced in these Cases, the United States Trustee's requirement would cause disruption to the management of the Debtors' wind down, particularly with respect to their self-insured health benefits program.

30. Accordingly, I believe that maintenance of the Bank Accounts, the Cash

Management System, and the Debtors' self-insured health benefits program will greatly facilitate the Debtors' expeditious orderly liquidation of their estates.

31. For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the first day motions filed concurrently herewith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Wilmington, DE
September 24, 2009

Bethny, LLC, Bethny Place, LLC, and Bethny I, LLC

By: Barbara Parasco
Title: Chief Executive Officer